# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **FREDERICK J. GREDE, not individually but as Liquidation Trustee for the Sentinel Liquidation Trust,** | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 09 C 5214 ) |
| **MBF CLEARING CORPORATION,** | ) Judge Rebecca R. Pallmeyer ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This case is one of many disputes that arose in the wake of Sentinel Management Group, Inc.'s collapse nearly ten years ago. Sentinel was an investment management firm based in Northbrook, Illinois, that, until its demise, was in the business of managing short-term cash for its clients—mostly other financial institutions. Under federal law and the terms of its contracts, Sentinel was required to hold its clients' assets in segregated accounts. Instead, Sentinel pledged the securities in its clients' accounts as collateral for loans from the Bank of New York ("BONY"), which Sentinel then used to buy even more securities on its own "house" account for the benefit of corporate insiders. When credit markets tightened, Sentinel took out more and more loans from BONY to cover the cost of client redemptions—all the while lying to its clients and frantically shifting around funds to mask the shortfalls. By the time Sentinel filed for Chapter 11 bankruptcy on August 17, 2007, it had lost more than $600 million of its clients' money. *See United States v. Bloom*, 846 F.3d 243, 245–46 (7th Cir. 2017) (affirming the convictions of Sentinel CEO Eric Bloom for nineteen counts of wire fraud and investment advisor fraud).

Defendant MBF Clearing Corp. is a Delaware corporation with its principal place of business in New York City. MBF had been investing with Sentinel since 2003. Between August 7 and August 9, 2007—the eve of Sentinel's bankruptcy—MBF withdrew all of its funds

from Sentinel. (Amended Complaint [82], ¶¶ 108–10.) Plaintiff Frederick J. Grede, the Liquidation Trustee for the Sentinel Liquidation trust, has filed a number of avoidance actions seeking recovery of dispersed funds, including, here, the funds recovered by MBF days before Sentinel's Chapter 11 filing.

The Trustee's original Complaint sought the return of $81.4 million in pre-petition transfers made to MBF as an avoidable preference under 11 U.S.C. § 547. (Complaint, Ex. A to Memorandum in Law in Support of MBF Clearing Corp.'s Motion to Withdraw the Reference [1-4] ("First Complaint"), ¶ 1.) MBF filed a motion for judgment on the pleadings [63] in 2014, but Judge Zagel of this court held the motion under advisement for several years. On June 1, 2017, this court reinstated and granted the Defendant's years-old motion without prejudice in light of the Seventh Circuit's decision to dismiss similar preference claims in a related "test case," *Grede v. FCStone, LLC*, 746 F.3d 244 (7th Cir. 2014) ("*FCStone I*"). The court granted the Trustee leave to amend his complaint, however, and the Trustee now pursues a new legal theory. This Amended Complaint seeks the return of a smaller sum, $32.7 million, under the theory that this smaller sum was an actual fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A). (Amended Complaint ¶ 1.) Additionally, the Amended Complaint seeks the return of an undisclosed amount of "false profits in the form of purported 'interest'" that the Trustee also alleges were fraudulently transferred to MBF just before Sentinel's bankruptcy. (*Id.* at ¶ 111.)

MBF has moved to dismiss the Amended Complaint on two grounds. First, MBF urges that the statute of limitations on a fraudulent conveyance claim has expired, and asserts that the Trustee's Amended Complaint does not "relate back" to the original, or, alternatively, that the Trustee's amendments run afoul of the equitable doctrine of laches. (Memorandum of Law in Support of MBF Clearing Corp.'s Motion to Dismiss the Amended Complaint [85] ("Def.'s MTD"), 1.) MBF's other argument for dismissal rests on a second Seventh Circuit decision in the *FCStone* test case: *Grede v. FCStone, LLC*, 867 F.3d 767 (7th Cir. 2017) ("*FCStone II*").

2

Based on the holding in *FCStone II*, MBF claims that the Trustee is collaterally estopped from arguing that the funds returned to MBF were a part of the bankrupt estate—a necessary component of a fraudulent transfer action. (MBF Clearing Corp.'s Reply Brief in Support of its Motion to Dismiss the Amended Complaint [91] ("Def.'s Reply"), 1–2.)

For the reasons explained here, the Defendant's Motion to Dismiss is denied.

## **FACTUAL BACKGROUND**

The details of Sentinel's business have been well documented in more than a dozen published and unpublished opinions dating back to 2009, so a brief overview is all that is required here.[1] Sentinel Management Group, Inc. was an Illinois corporation that provided cash-management services for institutional investors, hedge funds, and individuals. (Amended Complaint ¶ 10.) Sentinel "marketed itself to its customers as providing a safe place to put their excess capital, assuring solid short-term returns, but also promising ready access to the capital*." In re Sentinel Management Group, Inc.*, 728 F.3d 660 (7th Cir. 2013) ("*BONY I*"). Its primary business was in handling short-term investments for futures commission merchants ("FCMs")—entities that trade in the futures and options markets and that are regulated by the Commodity Futures Trading Commission ("CFTC"). *See Bloom*, 846 F.3d at 246. As described by Judge Hamilton in a related criminal case stemming from Sentinel's bankruptcy:

> Sentinel's business model was unusual and perhaps unique. It was registered with the CFTC as an FCM, but it did not trade in futures or options. Instead, Sentinel invested funds for other FCMs and, like a mutual fund, paid a return based on profits and losses. Sentinel was the only company that the CFTC permitted to operate in this manner.

*Id.* As an FCM itself, Sentinel was governed by the same securities laws and regulations as its clients. These regulations limited Sentinel's investments to "the highest grade securities and

---

[1] *See, e.g., SEC v. Sentinel Management Group, Inc.*, No. 07-cv-4684, 2012 WL 1079961, at *1 (N.D. Ill. Mar. 30, 2012) (granting summary judgment for the SEC in its civil enforcement action against Sentinel's Vice President Charles Mosley); *In re Sentinel Management Corp.*, 809 F.3d 958, 964 (7th Cir. 2016) ("*BONY II*") (holding that BONY was on inquiry notice of Sentinel's fraud and had received avoidable fraudulent transfers); *Bloom*, 846 F.3d at 245–46 (affirming Sentinel CEO Eric Bloom's fraud convictions).

3

similar highly liquid investments"—such as U.S. Treasury bills—and required Sentinel to maintain its clients' funds in segregated accounts. (Amended Complaint ¶¶ 12–26) (citing 17 C.F.R. § 1.25 and 7 U.S.C. § 6d(b)). Sentinel's clients could also demand the return of their investments at any time.

Sentinel offered a variety of investment programs, but ultimately pooled all of its clients' assets into one of three segregated custodial accounts at the Bank of New York. Sentinel called these accounts SEG 1, SEG 2, and SEG 3. (Amended Complaint ¶ 11.) Sentinel also set up a single, non-segregated clearing account at BONY, through which all purchases and sales of government securities were processed on a daily basis before being posted to the appropriate permanent, segregated account. (*Id.* at ¶¶ 33–34.) MBF's funds were assigned to SEG 1 and SEG 2 throughout its relationship with Sentinel. In addition to making trades for its clients, Sentinel traded on its own "house" account for the benefit of corporate insiders including the chairman, Philip Bloom; the CEO, Eric Bloom; and the vice-president of trading, Charles Mosley. (*Id.* at ¶ 15.) Federal law, federal regulations, and Sentinel's client agreements all required client funds to be kept separate from each other as well as from Sentinel. (*Id.* at ¶ 16.) As has been well established, Sentinel failed to do this:

> Sentinel routinely used hundreds of millions of dollars in securities it had allocated to customers as collateral to support Sentinel's own borrowing to pursue its leveraged trading strategy for its own benefit. It moved those securities out of segregation and into a lienable account at the Bank of New York, its main lender, putting customer property at risk for Sentinel's benefit. As Sentinel's leveraged trading increased, its outstanding debt ballooned, and it drew more and more on its customers' assets to support its borrowing habit.
>
> During the summer of 2007, Sentinel's investment scheme collapsed. As credit markets tightened and liquidity dried up on Wall Street (this was the beginning of what would become the financial crisis of the late 2000s), the market value of many Sentinel assets dropped. Sentinel's trading partners began making demands that forced it to borrow more heavily and in turn to provide more collateral—which it did by using customers' property as collateral.

*FCStone II*, 867 F.3d at 772; *see also Bloom*, 846 F.3d at 246–50.

Sentinel was also supposed to allocate the interest income on its clients' securities on a daily basis, but failed to meet this obligation. Instead of paying its clients their actual earnings, Sentinel calculated interest based on the total pool of securities, regardless of who owned or controlled them at the time. (Amended Complaint ¶ 47.) "Sentinel then allocated to customers approximations of what Sentinel thought customers expected to earn." (*Id.*) This yield manipulation was sometimes used to inflate Sentinel's claimed returns in order to draw in new customers, and was at other times understated so that Sentinel's managers could pocket the difference themselves, or try to pay off the daily interest on the BONY loan. (*Id.* at ¶¶ 48, 81.) In the case of SEG 1, the interest reported to those customers "was in the aggregate overstated by millions of dollars" and reflected interest that should have been attributed to other SEGs. (*Id.* at ¶ 82.) In effect, "Sentinel treated all of the more than $3 billion in securities it controlled as part of a single undifferentiated pool." (*Id.* at ¶ 77.) Sentinel's daily allocations of specific securities to segregated accounts were "solely for the purpose of reporting to customers," and, more often than not, "complete fabrication[s]" since Sentinel had already pledged those same securities as collateral for BONY's ever-increasing loan. (*Id.* at ¶¶ 77–78.)

By August 2007, "Sentinel no longer slouched toward bankruptcy; it careened." *Bloom*, 846 F.3d at 249. Credit markets tightened and clients started redeeming funds at an unsustainable rate. *Id.* To cover the cost of these redemptions, Sentinel's managers started shifting client funds across the segregated accounts. (Amended Complaint ¶ 84–98.) Unable to keep shuffling the deck, and faced with its massive debt to the Bank of New York, Sentinel halted client redemptions on August 13. (*Id.* at ¶ 101.) Four days later, Sentinel filed a voluntary petition for Chapter 11 bankruptcy.

MBF was one of the lucky few that managed to withdraw funds from Sentinel before its collapse. Across four transfers made between August 7 and August 9, 2007, MBF withdrew all of its funds from Sentinel—an amount totaling $32,724,350.01. (*Id.* at ¶¶ 1, 108–09.) All told, in

5

the ninety days before Sentinel filed for bankruptcy, MBF received a total of $81,374,351 from Sentinel. (First Complaint ¶¶ 1, 88.)

## PROCEDURAL BACKGROUND

This is the Trustee's second shot at stating a claim for relief. Grede's original complaint, filed back in 2009, sought the return of roughly $81.4 million in pre-petition transfers made by Sentinel to MBF as avoidable preferences under 11 U.S.C. § 547. (First Complaint ¶¶ 80–89.). MBF filed motions for summary judgment and for judgment on the pleadings in 2012 and 2014, respectively. Judge Zagel held these motions in abeyance for several years as related cases traveled back and forth between the District Court and the Seventh Circuit. In March 2016, Judge Zagel denied all the motions without ruling on the merits and issued a blanket stay across all the Plaintiff's remaining avoidance actions pending a final resolution of the designated test case, *Grede v. FCStone, LLC*, No. 09-cv-136. (Denial and Stay Order [76].)

After Judge Zagel took senior status in April 2017, all of the cases arising from Sentinel's bankruptcy were reassigned to this court. (Executive Committee Order [77].) Based on the Seventh Circuit's decision in *FCStone I*—which found similar alleged preferences to be shielded by the Code's "safe harbor" provisions—this court reinstated and granted MBF's motion for judgment on the pleadings without prejudice. (Minute Entry [80]; Ruling on Motion [81].) On June 21, 2017, Grede amended his complaint to assert a new theory of recovery: that Sentinel's pre-petition transfers to MBF were not preferences, but actual fraudulent conveyances as defined by 11 U.S.C. § 548(a)(1)(A). (Amended Complaint ¶ 1.) Specifically, Grede alleges that the four transfers Sentinel made in August 2017 to close out MBF's account were made with an "actual intent to hinder, delay, or defraud" Sentinel's other creditors. (*Id.* at ¶ 116.) These transfers amounted to $32,724,350.01. (*Id.* at ¶ 1.) Grede further alleges that Sentinel made several other, unspecified transfers of "false profits" to MBF in the 90 days leading up to its bankruptcy petition. (*Id.* at ¶ 111.) Grede seeks the return of these additional payments to the estate as well.

6

MBF has responded with this Motion to Dismiss, arguing that the Amended Complaint "runs directly afoul of the statute of limitations provided in Section 546(a)(1) of the Bankruptcy Code, and the equitable doctrine of laches." (Def.'s MTD 1.) In its Reply Brief, MBF introduced a third rationale for dismissing the Plaintiff's Amended Complaint: that it is barred by collateral estoppel as a result of the Seventh Circuit's final ruling in the *FCStone* test case.[2] (Def.'s Reply 1–2.)

### DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When applying this standard, the court "accept[s] as true all well-pleaded facts in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (internal citation and quotation marks omitted). Federal Rule of Civil Procedure 12(b) applies to adversary proceedings through Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

**1.    Relation Back**

Under the relevant provisions of the Bankruptcy Code, an action to recover fraudulent transfers must be filed within two years of the commencement of a voluntary case. *See* 11 U.S.C. § 546(a)(1); 11 U.S.C. § 301(b). As Sentinel filed for bankruptcy on August 17, 2007, and the Trustee did not amend his Complaint to include the fraudulent transfer allegations until June of this year, that window is long since closed—something the Trustee does not contest. Accordingly, the critical issue in this proceeding regards whether the present allegations "relate back" to the original complaint in order to avoid the Code's statute of limitations.

---

[2]    The Seventh Circuit issued *FCStone II* on August 17, 2017—after MBF filed its Motion to Dismiss. MBF raised this defense for the first time in its Reply Brief, and Plaintiff Grede was afforded leave to file a Sur-Reply to respond to the new argument. (*See* Trustee's Sur-Reply in Opposition to MBF Clearing Corp.'s Motion to Dismiss [95] ("Pl.'s Sur-Reply"), 2.)

7

An amendment "relates back" to an earlier, timely filing when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1)(B). "In general, relation back is permitted . . . where an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading." *Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996). The Seventh Circuit has long instructed that "amendments pursuant to Rule 15(c) should be freely allowed." *Staren v. Am. Nat. Bank & Trust Co. of Chicago*, 529 F.2d 1257, 1263 (7th Cir. 1976). The critical inquiry under Rule 15(c) "is whether the original pleading afforded the defendant sufficient notice of what he must defend against." *In re Gaslight Club, Inc.*, 167 B.R. 507, 517 (Bankr. N.D. Ill. 1994); *see also Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 410 (7th Cir. 1989).

The Trustee's Amended Complaint easily meets that standard. The Amended Complaint not only covers the same "common core of operative facts," *Mayle v. Felix*, 545 U.S. 644, 659 (2005), it challenges the exact same transfers described in the original complaint. Different claims for relief arising from the same "transactions" clearly fit within the scope of Rule 15(c). The Defendant argues that "an amendment cannot relate back if different facts are essential to reach that result." (Def.'s MTD 7.) This is a correct statement of the law, but inapplicable to this dispute. The case law does not require an exact match. In fact, plaintiffs are free to "supplement[ ] the legal theory and facts" in an amended complaint provided those additions arise from the original complaint. *Luckett v. Conlan*, 561 F. Supp. 2d 970, 975 (N.D. Ill. 2008); *see also Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3rd Cir. 2004) ("[A]mendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c).").

8

Nevertheless, MBF argues that the facts required to support a fraudulent conveyance claim are so distinct from those required to prove a voidable preference that the Trustee's amendments do not relate back. (Def.'s Reply 3.) While the Trustee's new fraudulent conveyance claim does indeed require proof of new facts—namely, Sentinel's intent—the core facts concerning the specific transfers and the context in which they arose remain the same. The date and amounts of the transfers, the parties involved, the details of Sentinel's business, and the greater context of its fraud and subsequent collapse are matters common to both complaints. Furthermore, as the Trustee points out, many of the added portions in the Amended Complaint merely provide updates on the various other cases arising from Sentinel's ten-year-old bankruptcy. (Trustee's Memorandum of Law in Opposition to MBF Clearing Corp.'s Motion to Dismiss [87] ("Pl.'s Resp."), 8) (citing Amended Complaint ¶¶ 4, 60, 103-106.) None of the remaining differences—in particular, new paragraphs 55–58 describing Sentinel's accounting system—are so critical as to push the remainder of the allegations beyond the core nucleus of fact shared by both complaints. *See, e.g. In re Colonial Cheshire I Limited Partnership*, 167 B.R. 748, 751 (Bankr. D. Ct. 1994) (permitting untimely fraudulent transfer claims to relate back even though this required the defendant "to investigate and defend against some additional details or circumstances"). The Trustee has not engaged in the sort opportunistic "bootstrapping" courts are warned against when deciding whether an untimely amendment relates back. *See In re Gerardo Leasing, Inc.*, 173 B.R. 379, 389 (Bankr. N.D. Ill. 1994).

Most importantly, however, MBF's argument is at odds with the vast weight of authority, both in this circuit and beyond. Numerous courts have permitted plaintiffs who originally alleged that a pre-bankruptcy transfer was preferential to later re-categorize that same transfer as a fraudulent conveyance. *See, e.g., In re Integrated Agri, Inc.*, No. 03-8231, 2007 WL 605018, at *3 (Bankr. C.D. Ill. Feb. 22, 2007) (collecting cases); *In re Frank Santora Equip. Corp.*, 202 BR 543, 545 (Bankr. E.D.N.Y. 1996); *Colonial Cheshire*, 167 B.R. at 751. Courts in this district

have extended the rule even farther. In *In re Gerardo Leasing, Inc.*, 173 B.R. 379 (Bankr. N.D. Ill. 1994), the bankruptcy court permitted the plaintiff to add fraudulent conveyance claims concerning *different* transfers than those sought to be avoided as preferential in the original complaint where the two sets of payments were plausibly alleged to "be part of a single pattern of conduct." *Id.* at 390; *see also PNC Equip. Fin., LLC v. Zilberbrand*, No. 12-CV-03074, 2014 WL 448384, at *6–7 (N.D. Ill. Feb. 4, 2014) (finding that fraudulent transfer allegations based on a prenuptial agreement related back to the original complaint, which did not mention the agreement but alleged similar fraudulent transactions).

The sole case that MBF cites in support of its position, *In re Gantos, Inc.*, 283 B.R. 639 (Bankr. D. Conn. 2002), does indeed hold the opposite, but its reasoning is not persuasive. *Gantos* has largely been cited only as an outlier that other courts have declined to follow. *See In re Integrated Agri, Inc.*, 2007 WL 605018, at *3; *In re E-Z Serve Convenience Stores, Inc.*, No. 04-09172, 2005 WL 4882753, at *3-4 (Bankr. M.D.N.C. Dec. 12, 2005). In addition. MBF's efforts to distinguish the near-uniform line of cases permitting relation back in cases like this one are not convincing. MBF claims that relation back is not warranted in this case because "in most of the bankruptcy cases [Trustee] cites, the courts noted that the basis for the addition of the fraudulent conveyance claim was the discovery of *new facts*." (Def.'s Reply 3–4.) This argument makes little sense. MBF's primary objection in its Motion to Dismiss was that the Trustee's fraudulent conveyance claim was too factually dissimilar to permit relation back. (Def.'s MTD 7–9.) Rule 15 cannot simultaneously require and prohibit "new facts." If anything, the fact that those other courts allowed untimely amendments to relate back after the discovery of new evidence provides *greater* support for the doctrine's application in cases such as this one where no such new evidence is cited.

Relation back is not permitted in "abusive situations such as undue delay, bad faith or dilatory motive on the part of the movant, . . . [or] undue prejudice to the opposing party." *In re Barnes*, 96 B.R. 833, 836 (N.D. Ill. 1989). MBF asserts that "the Trustee's conduct smacks of

bad faith," (Def.'s MTD 9), but the court sees no real case for finding such abuse here. As discussed in the following section, any alleged prejudice is excusable, unavoidable, or nonexistent. Defendant may be understandably annoyed that this case is still alive after eight years, but the mere fact of delay is not dispositive under Rule 15(c)(1)(B). The facts alleged in the original Complaint were more than sufficient to put MBF on notice that the Trustee may later seek to recover the same transfers under a different legal theory.

**2.    Laches**

The question of prejudice to MBF also arises in its alternative argument that the Trustee's Amended Complaint is barred by the equitable doctrine of laches. (Def.'s MTD 10–11.) Laches is a defense "derived from the maxim that those who sleep on their rights, lose them*." Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002). To support a finding of laches, a defendant must show an inexcusable delay on the part of the plaintiff resulting to prejudice to the defendant. See id at 792–93. Decisions on the issue of laches rest within the district court's sound discretion. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). While similar to a statute of limitations defense, laches "involves more than the mere lapse of time and depends largely upon questions of fact." *5* Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1277 (3d ed. 2017). As a result, the question is generally more suited for resolution at the summary judgment stage than in a motion to dismiss. *Id.*

As a preliminary matter, the Trustee asserts that a laches defense is not available in bankruptcy proceedings at all. (Pl.'s Resp. 11–12.) Laches, the Trustee states, "is a state law defense, not found anywhere in the Bankruptcy Code." (*Id.* at 12) (citing *Nature Conservancy v. Wilder Corp. of Del.*, 656 F.3d 646, 649 (7th Cir. 2011)). MBF is not invoking Bankruptcy Code procedures in this instance, however. MBF relies here on Federal Rule of Civil Procedure 8(c) as a defense to the relation back of amendments. See FED. R. CIV. P. 8(c). In a motion to dismiss, parties are entitled to assert laches as an alternative basis for objecting to relation back. *See, e.g. United City of Yorkville v. Ocean Atlantic Service Corp.*, No. 11-cv-1984, 2013

11

WL 5433429, at *6–*8 (N.D. Ill. Sept. 30, 2013) (discussing the applicability of both laches and relation back in the context of an amended complaint otherwise barred by a statute of limitations). The Trustee cites numerous other cases in support of its position, however none are on point. While courts routinely reject equitable defenses to the *merits* of claims in bankruptcy proceedings,[3] the Trustee has not cited any authority supporting the idea that laches, specifically, may not be invoked to bar untimely pleadings just because the underlying dispute involves a bankrupt party. Indeed, courts nationwide routinely consider laches as a defense to untimely complaints in bankruptcy proceedings. *See In re Perry*, No. AZ-13-1438-TaPaKi, 2014 WL 4212625, at *5–*6 (B.A.P. 9th Cir. Aug. 26, 2014); *In re Dini*, 566 B.R. 220, 228–32 (Bankr. N.D. Ill. 2017); *In re Am. Home. Mortg. Holding*, 458 B.R. 161, 172–174 (Bankr. D. Del. 2011).

In any event, MBF is unable to prove the elements of laches here. Laches requires both unreasonable delay and resulting prejudice. MBF insists that "delay is evident from the face of the Initial and Amended Complaints and other items for which the court can take judicial notice." (Def.'s MTD 10.) While this litigation has been pending for over eight years, MBF oversimplifies the matter greatly. As stated, this case has effectively been either officially or unofficially "on pause" since the selection of *Grede v. FCStone*, No. 09-cv-136, as a test case for all the SEG 1 defendants back in 2012. This is not grounds for denying the Amended Complaint. *See Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938–39 (3d Cir. 1984) (reversing the district court's denial of leave to file an amended complaint as an abuse of discretion where the parties had been waiting for resolution of a related state claim); *PAC for Middle Am. v. State Bd. of Elections*, No. 95-cv-827, 1995 WL 571887, at *4 (N.D. Ill. Sept. 22, 1995) (holding that the

---

[3] *See, e.g., In re Fin. Res. Mortg., Inc.*, 454 B.R. 6, 24 (D.N.H. 2011) (holding the defense of *in pari delicto* not applicable in avoidance actions); *In re Auto. Prof'ls., Inc.*, 398 B.R. 256, 260 (Bankr. N.D. Ill. 2008) (holding that *unclean hands* was not a valid defense to a claim for equitable subordination); *In re Kmart Corp.*, 318 B.R. 409 (Bankr. N.D. Ill. 2004) (holding the defenses of *unclean hands*, *setoff*, and *recoupment* not applicable in preference actions under Section 547(c)); *In re Roti*, 271 B.R. 281, 292 (Bankr. N.D. Ill. 2002) (holding the defense of *good faith* inapplicable in an action for the turnover of property).

"time clock for laches" started after the Supreme Court decided a related case). It is true that the Trustee did not base his new fraudulent conveyance claims on the discovery of new evidence (*see* Def.'s Reply 8), but that is not a requirement to either invoke the relation-back doctrine or to avoid a laches defense. It is, at best, informative of his intent. Given the other factors and the context of the ongoing disputes over Sentinel's remaining assets, the delay in this case is best described as an intentional response to the difficult procedural posture, not an unreasonable or inexcusable one.

As MBF has not established *inexcusable* delay, the question of prejudice is moot, *see Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir. 1988), but the court addresses it briefly in the interests of a complete record. MBF insists that it is "obviously severely prejudiced" due to changed circumstances and unavailable evidence in light of the fact that "Sentinel was liquidated a decade ago, and its principals are in prison." (Def.'s MTD 11.) These concerns are overblown. Given the active litigation in related cases, there is no reason to think that evidence will be any less available now than it was at the time the case was filed. In fact, the opposite may be true. Over the years, the SEG 1 defendants have compiled their own database of documents for use in the FCStone test case, and the Trustee already has access to many pieces of evidence applicable across his many avoidance actions. (Pl.'s Resp. 14.) This court is inclined to agree with the Trustee's claim that the parties actually "have *more* information about Sentinel's operations and . . . its collapse" than before. (*Id.*) And while Eric Bloom and Charles Mosley are currently serving time in federal prisons, they are potentially more useful as witnesses today now that their convictions have reduced the scope of their Fifth Amendment right against self-incrimination. *See United States v. Wright*, 634 F.3d 917, 920 (7th Cir. 2011) (citing *Mitchell v. United States*, 526 U.S. 314, 325 (1999)). In any case, Bloom and Mosley may well be more willing to testify than they would have been absent their convictions. Memories indeed "fade over time," as MBF asserts (Def.'s Reply 9), but there is little reason to think that would be the case here considering that Bloom's conviction, for example, was only

affirmed by the Seventh Circuit in January 2017. *See Bloom*, 846 F.3d at 243. At the very least, the issue of prejudice involves open questions of fact not apparent from the face of the complaint and thus not appropriate to determine in a motion to dismiss.

Finally, MBF stresses the "sliding scale" nature of the laches inquiry: that a long period of time accordingly reduces the level of prejudice required. (Def.'s Reply 10) (citing *In re Dini*, 566 B.R. at 227). Again, however, given the excusable nature of the delay and minimal marginal prejudice present in this case, this court concludes finds that laches does not bar application of the "relation back" doctrine.

### 3. Collateral Estoppel based on *FCStone II*

On August 14, 2017, the Seventh Circuit handed down a final decision in the *FCStone* test case. In it, the panel held that a pool of money held back at the time of Sentinel's liquidation sale known as the "SEG 1 Reserve" ("the Reserves") was property held in trust for the SEG 1 defendants, and not property of the estate subject to pro rata sharing among Sentinel's other creditors. *FCStone II*, 867 F.3d at 779. MBF interprets this holding to mean that MBF's funds, too, were protected by statutory trusts and that the Trustee has no claim to avoid the pre-petition transfers for the benefit of an estate that never had legal ownership of those funds. (Def.'s Reply 1, 12–13) ("It is axiomatic that in order for the Trustee to maintain a fraudulent transfer claim, the transferred assets must be property of the bankruptcy estate.") MBF insists that the holding in *FCStone II* "is binding precedent for all the SEG 1 cases and compels dismissal of the Amended Complaint with prejudice." (*Id.* at 13.) Alternatively, MBF claims that the doctrine of collateral estoppel prevents the Trustee from litigating his remaining claims "as [he] had every incentive and opportunity to vigorously litigate these issues in the FCStone Case." (*Id.*)

Collateral estoppel—also known as issue preclusion—prevents parties from engaging in duplicative litigation by "treat[ing] as final [ ] those questions actually and necessarily decided in a prior suit." *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979). Parties may assert collateral

14

estoppel only when: (1) the issues addressed are identical, (2) the issue was actually litigated in the prior proceeding, (3) determination of the issue was essential to the prior judgment, and (4) the party against whom issue preclusion is being invoked was fully represented in the prior action. *Matrix IV, Inc. v. American Nat. Bank and Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011).

Despite MBF's creative reading of *FCStone II*, it is clear that the Seventh Circuit's decision does not extend to this dispute. The issues addressed are distinct. The dispute over ownership of the SEG 1 Reserve funds was a unique issue created by the intersection of the Commodity Exchange Act's statutory trusts and the various parties' rights under the confirmed plan. *FCStone II*, 867 F.3d at 779. On remand from *FCStone I*, the district court had held that the SEG 1 and SEG 3 groups of creditors both benefitted from statutory trusts and that it would be improper to favor one trust over another. *Grede v. FCStone, LLC*, 556 B.R. 357, 365 (N.D. Ill. 2016) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)). The Seventh Circuit reversed, saying that because the SEG 3 defendants had opted out of their trust claims under the approved Chapter 11 plan and "agreed to be treated as unsecured creditors," the issue of "parallel statutory trusts" was avoided. *FCStone II*, 867 F.3d 767, 781–83.

Overall, collateral estoppel cannot apply to bar the Trustee in this case because *FCStone* did not involve fraudulent transfer allegations. The test case's first trip up on appeal did deal with pre-petition preference claims similar to those alleged in the Trustee's original complaint, *see FCStone I*, 746 F.3d at 251–54, but the Trustee has already dealt with any issues of preclusion in that context by amending his complaint to change the cause of action to allege actual fraudulent transfers. Absent the original preference claims, MBF is only tangentially related to the final *FCStone* opinion by virtue of MBF's status as a former investor assigned to the SEG 1 account. MBF had no claim to the reserve funds; it was paid in full just days before Sentinel filed for Chapter 11. As summarized by the Trustee: "*FCStone* involved a

15

dispute over *different* funds, involved *different* facts, and was decided in a *different* procedural context." (Pl.'s Sur-Reply 5.)

In this case and others still outstanding since *FCStone II* was decided, there appears to be some confusion as to the scope of the Seventh Circuit's holding. After finding that only the SEG 1 defendants were protected by a statutory trust, the remaining issue on appeal was whether those defendants could trace their original investments to the remaining Reserve funds. *FCStone II*, 867 F.3d at 783–84. Given Sentinel's extensive comingling of funds, the district court had observed that tracing particular funds in the Reserve to a specific customer accounts would be difficult, "if not impossible." *Grede v. FCStone, LLC*, 556 B.R. at 365. The Seventh Circuit disagreed, pointing to "essentially unrebutted" evidence that FCStone, LLC could, in fact, trace its own funds. *FCStone II*, 867 F.3d at 784–86. Furthermore, the court stated:

> And if the customer cannot actually trace, it should nevertheless be entitled to rely on reasonable tracing conventions (or "fictions"). Though a variety of tracing conventions might be helpful in a case like this, the CFTC proposed that "assets in the Sentinel Seg 1 accounts and portfolios at the time of the Sentinel bankruptcy must be considered to have been held in a trust under the [Act] independent of any requirement on the part of customers to trace particular assets." Supplemental Amicus Curiae Memorandum of CFTC at 7–8, *Grede v. FCStone, LLC*, 485 B.R. 854 (N.D. Ill. 2013) (No. 09 C 136, Dkt. Entry 87), reprinted in FCStone App. at 842. We agree with the CFTC's view . . . .

*Id.* at 783–84. MBF cites this to support its contention that "tracing is inapplicable to the MBF transfers because . . . when MBF received the funds, it was presumed those funds were the ones held in statutory trust for MBF." (Def.'s Reply 13.) In this court's view, however, MBF is confusing where the funds originated with where the funds *went*. The Seventh Circuit endorsed a rebuttable presumption that money coming from a given segregated account should be deemed trust property of the account holder; the Seventh Circuit was not establishing a mandatory rule that money received by customers must be deemed to have come from their own accounts.[4] *See FCStone II*, 867 F.3d at 783–84. This sort of "end justifies the means"

---

[4] By way of analogy, if a customer walks into a bank to withdraw $100 from her savings account, it is safe to assume that the balance shown to exist in her account belongs to

16

reasoning would undermine the entire purpose of banning fraudulent conveyances in the first place.

Second, the quoted passage expressly limits the scope of the tracing convention to only those assets in the SEG 1 account "*at the time of the Sentinel bankruptcy.*" *Id.* at 783 (emphasis added). Nothing in *FCStone II* supports MBF's position that any transfer, received at any time, should be unquestionably presumed to have been made with funds held in statutory trust for the recipient. *See id.* at 784 n.8 ("At oral argument, FCStone contended that beneficiaries of a statutory trust should enjoy an 'irrebuttable' presumption of entitlement to assets held in a segregated account 'no matter how they got there.' We need not and do not endorse this view.").

Even if MBF's view of *FCStone II* were correct, it still would not be entitled to win dismissal here. Assuming that MBF's funds in the SEG 1 and SEG 2 accounts were protected by statutory trusts ahead of Sentinel's bankruptcy, the Amended Complaint bypasses that protection. Instead, "[t]he Trustee claims that the funds Sentinel used to repay MBF came from an under-segregated account held for the benefit of a different class of customers (the 'SEG 3' customers) and not from the accounts Sentinel held for MBF." (Pl.'s Sur-Reply 2; Amended Complaint ¶¶ 98–100, 109–10.) The Trustee further claims that Sentinel paid MBF "fictitious interest" or "false profits" that were similarly not traceable to MBF's original investments and which instead only served to cover up Sentinel's fraudulent scheme. (Pl.'s Sur-Reply 4–5; Amended Complaint ¶¶ 110–11) Regardless of whether or not MBF's investment funds became a part of Sentinel's estate, MBF is not entitled to receive other customers' money. As fellow SEG 1 defendant FCStone, LLC, successfully argued in the recent decision: "[if] the funds are

---

her. It would be improper, however, to assume that money placed in the customer's hand necessarily came from her account—particularly where, as here, a third party alleges that the teller withdrew the $100 bill from someone else's savings account to conceal the fact that the teller stole everything from the customer's account weeks earlier.

17

protected by a statutory trust . . . it would be improper to disburse that trust property to other claimants." *FCStone II*, 867 F.3d at 779.

Evidence presented in a motion for summary judgment or at trial may ultimately vindicate MBF, but for the purposes of this motion to dismiss, the court must assume that the Trustee's allegations are true. As argued by the Trustee: "MBF's construction of the common issue—that 'SEG 1 funds are not property of the Estate' ([Def.'s] Reply 13)—begs a critical factual question this lawsuit must resolve." (Pl.'s Sur-Reply 10.) MBF's reliance on the test case is misplaced. *FCStone II* does not control the outcome of this dispute. Nor does it undo the four other Seventh Circuit opinions finding that Sentinel's managers committed wire and investment fraud, made other pre-petition fraudulent transfers to the Bank of New York, and, tellingly, allocated the interest due to customers in a misleading manner. *See FCStone II*, 867 F.3d at 770 (discussing the earlier decisions in *FCStone I*, 746 F.3d 244; *BONY II*, 809 F.3d 958; and *Bloom*, 846 F.3d 243).

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss the Amended Complaint [83] is denied. Defendant is directed to answer within 21 days.

ENTER:

Dated: January 5, 2018

REBECCA R. PALLMEYER
United States District Judge